IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION No.: 5:11CV107-RLV

| | |
|---|---|
| SAACKE NORTH AMERICA, LLC, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Memorandum and Order** |
| ) | |
| LANDSTAR CARRIER SERVICES, INC., ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court upon Defendant Landstar Carrier Services, Inc.'s Motion for Partial Summary Judgment (Doc. 13), and Plaintiff Saacke North America, LLC's opposing Motion for Partial Summary Judgment (Doc. 15), as well as all related memoranda and exhibits.

### I. Background & Procedural History

This dispute stems from a loss sustained by Plaintiff Saacke North America, LLC ("Saacke"), in connection with the interstate shipment of freight from Illinois to North Carolina by Defendant Landstar Carrier Services, Inc. ("Landstar"). Saacke, a North Carolina corporation, is "in the business of the manufacture and sale of tools and machines." (Am. Compl., ¶¶1, 6; Hallman Aff., ¶ 4) Landstar, a Delaware corporation with its principal place of business in Florida, is "in the business of the commercial transportation of goods and materials." (Am. Compl., ¶¶ 2, 7)

In September 2010, Saacke attended an International Machinists' Trade Show ("IMTS") in Chicago, Illinois, sponsored by Global Experience Specialists ("GES"). (Am. Compl., ¶ 9) Timothy Hallman ("Hallman"), Saacke Member-Manager, and Mark Wortsman ("Wortsman"),

Application and Sales Engineer, represented Saacke at the event. (Hallman Aff., ¶ 2, 14; Wortsman Aff., ¶¶ 2,3)

Before the trade show concluded, Hallman contacted a shipping broker from Davidson, North Carolina, M.I. Logistics ("MIL"), to arrange for the transportation of Saacke's commercial goods and equipment from the trade show back to Saacke's place of business in Mooresville, North Carolina.[1] (Hallman Aff., ¶¶ 6-8; Am. Compl., ¶ 13)  In arranging for return transport, Hallman dealt with MIL representative, Bernie Manion ("Manion"). (Hallman Aff., ¶ 9)  MIL selected Landstar as the carrier to transport the Saacke goods. (Hallman Aff., ¶ 10; Wortsman Aff., ¶ 7)  Hallman avers that prior to shipment, MIL – not GES or Landstar – provided Saacke with a rate quote for the costs of the shipment of the freight.[2] (Hallman Aff., ¶ 11)

According to Saacke, GES required a bill of lading in order to move Saacke's goods from the trade show *floor* to the trade show *shipping area*.[3] (Hallman Aff., ¶ 16; Wortsman Aff., ¶ 4)  GES prepared and presented a bill of lading to Wortsman ("GES bill of lading") on September 19, 2010, which Wortsman signed off on on Saacke's behalf. (Wortsman Aff., ¶ 6)  Wortsman indicated on the GES bill of lading that the goods were to be transported "VIA: other carrier" (*i.e.*, Landstar) to their ultimate destination. (Wortsman Aff., ¶¶ 5, 6)  Shipping was scheduled for September 21, 2010. (Am. Compl., ¶ 8; Wortsman Aff., ¶ 8)  According to Saacke's

---

[1] Saacke's freight is described as "seven (7) pallets / crates weighing a total of 16,360 pounds." (Am. Compl., ¶ 13) The record does not reflect how Saacke transported its goods to Illinois in the first place.

[2] Saacke does not produce any documentary evidence of the MIL rate quote.

[3] "A "bill of lading" is a contract that records that a carrier has received goods from the shipping party, states the terms of carriage, and is evidence of a contract for carriage.  A bill of lading also is a receipt for goods to be transported, and usually contains the description, quantity and condition of the goods, their classification and, traditionally, reference to the carrier's filed "tariff."" *ABB, Inc. v. CSX Transportation, Inc.*, EDNC Case No.: 5:08CV25-F, Doc. 105, March 22, 2012 Order at 4.) (internal citation omitted).

evidence, the GES bill of lading was entered into between GES and Saacke for the sole purpose of handling Saacke's goods while the trade show was underway. (Hallman Aff., ¶¶ 21, 22; Wortsman Aff., ¶¶ 4-7)

At some point between September 19th and 21st, Landstar picked up the Saacke freight from the GES trade show shipping area and placed the goods on a tractor-trailer for transport to Mooresville, North Carolina. (Wortsman Aff., ¶ 8) According to Charles Smith, Landstar's Director of Cargo Claims, Saacke, presumably through GES, provided the GES bill of lading to Landstar's driver, who signed the bill and maintained it until delivered to Wortsman in North Carolina upon delivery.[4] (C. Smith Decl., ¶¶ 1 - 5).

Hallman and Wortsman were both in attendance when the Landstar tractor-trailer arrived at Saacke's place of business in North Carolina. (Hallman Aff., ¶ 26 ; Wortsman Aff., ¶ 10) Upon delivery of the Saacke freight, a second bill of lading, or "the Landstar bill of lading," was produced by the Landstar driver and given to Wortsman. (Hallman Aff., ¶¶ 13,24; Wortsman Aff., ¶¶ 9,15,17; Def.'s Response to Interrogatories, ¶¶ 5(a) - (c)). It is undisputed that Saacke was missing one of the seven pallets or crates which Landstar was responsible for.[5] (Hallman Aff., ¶ 27; Wortsman Aff., ¶ 11)

There is a discrepancy concerning the completion of the Landstar bill of lading. According to Saacke, while in Mooresville, the Landstar driver filled out a blank Landstar bill of

---

[4] It does not appear that Saacke had any employee physically present for the pick-up of its goods (or that Wortsman physically handed over the GES bill of lading to the Landstar driver). Landstar implies that GES acted as an agent of Saacke in producing the GES bill of lading to the Landstar driver at pick up. The question arises as to why the GES bill of lading was produced to the Landstar driver at all if the GES bill of lading was solely for the purpose of moving the Saacke freight to the shipping area.

[5] The lost pallet contained goods such as "computers, electronic equipment and other items of value." (Hallman Aff., ¶ 30) According to the Plaintiff's Notice of Intent to File Carrier Claim, Saacke's estimated total loss was $184,663.27. (Compl, Exh. A)

lading that he had with him in the tractor-trailer and wrote out the "shorted one crate" notation. (Hallman Aff., ¶ 28; Wortsman Aff., ¶¶ 12, 13) According to Landstar, Driver Carl Daniels entered information on the Landstar bill of lading *prior* to the shipment of goods, on September 20, 2010, in McCormick Place, Chicago, Illinois, and Wortsman made the "shorted one crate" notation *after* delivery.[6] (Def.'s Response to Interrogatories, ¶¶ 5(a) - (d)). This factual dispute is not material because under either version of the facts, the Landstar bill of lading was not presented to Saacke before shipment.

Despite the missing pallet, Saacke paid Landstar in full for the costs associated with shipping the freight to North Carolina. (Am. Compl., ¶ 12; Answer to Am. Compl., ¶ 12) Saacke submitted a claim for cargo loss to Landstar, which Landstar denied. (Am. Compl., ¶ 16; Answer to Am. Compl., ¶ 16)

On July 11, 2011, Saacke initiated litigation against Landstar in the General Court of Justice, Superior Court Division, Iredell County, North Carolina. (Doc. 1 / Case No. 11-CVS-2136 (the "State Court Action"). Saacke's Complaint originally alleged causes of action asserting breach of contract, negligence, and violation of the North Carolina Unfair and Deceptive Trade Practices Act., N.C. GEN. STAT. § 75-1.1. (Doc. 1 / Exh. A)

On August 5, 2011, Landstar filed a timely Notice of Removal asserting federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1441(a) and (b), and 1445(b). (Doc. 1) In the Notice of Removal, Landstar asserted that a federal question was presented pursuant to the Carmack Amendment to the Interstate Commerce Act ("Carmack"), 49 U.S.C. § 14706 *et seq.*, that Saacke's state law claims were barred by the doctrine of complete preemption, and that the

---

[6] In other words, Landstar contends that its driver entered everything on the form except the consignee's printed name and signature and the notation "shorted one crate," which Landstar concedes was handwritten by Wortsman.

federal court had exclusive jurisdiction over the controversy.[7] (Id., ¶¶ 5, 6).

On August 22, 2011, Saacke amended its Complaint to assert a single statutory claim pursuant to subsection (d) of Carmack, 49 U.S.C. § 14706, for the "loss of [] goods consigned under a bill of lading to Defendant Landstar, an authorized interstate motor carrier."[8] (Doc. 3 / Am. Compl., ¶¶ 1-21)

In April 2012, both parties moved for partial summary judgment. (Docs. 13-17)

Upon the parties' joint motion, the Pretrial Order & Case Management Plan was amended on March 15, 2012 to incorporate a stay of all other deadlines pending the Court's legal determination concerning Defendant Landstar's affirmative defense asserting limitation of liability. (Doc. 11)

## II. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically

---

[7] Carmack preempts a shipper's common law or state law remedies that would otherwise serve to increase a carrier's liability "beyond the actual loss or injury to the property." (Pl.'s Mem. In Supp., 2) (quoting Patricia Alvarez & Marc Yellin, Where to Start When Faced With a Motor Carrier Claim: The Carmack Amendment, For the Defense Magazine of the Defense Research Institute (2010) (citing 49 U.S.C. § 14706 (2005)); *see also Shao v. Link Cargo (Taiwan), Ltd.*, 986 F.2d 700 (4th Cir.1993) (Carmack Amendment completely preempts state law claims arising from damaged goods moved by a common carrier in interstate commerce); *Taylor v. Mayflower Transit, Inc.*, 22 F.Supp.2d 509 (W.D.N.C. 1998)(same).

[8] Landstar cites the ICC Termination Act, 49 U.S.C. § 13101 *et. seq.*, and the Carmack in support of its assertion that the federal court has "exclusive" jurisdiction. (Notice of Removal, ¶ 6) However, the federal and state courts have concurrent jurisdiction over a civil action brought pursuant to the Carmack. *See* 49 U.S.C. § 14706(d)(3) ("Jurisdiction of courts.--A civil action under this section may be brought in a United States district court or in a State court.) Landstar may have meant to refer to the exclusive nature of the remedy under the Carmack.

stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325.

When considering cross-motions for summary judgment, the court "examines each motion separately, employing the familiar [Rule 56(c)] standard." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (internal citations omitted); *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (Court reviews each motion separately on its own merits "to determine whether either party deserves judgment as a matter of law") (internal citations omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Rossignol,* 316 F.3d at 523 (internal citation omitted).

### III. Discussion

The legal issue presented by the parties' competing motions for partial summary judgment is whether Landstar's liability is limited pursuant to the Carmack Amendment's exemption to carrier liability for the shipper's actual loss.[9]

---

[9] Landstar does not concede liability but explains that, "if it is found liable, its liability must be limited in accordance with the contractual terms." (Def.'s Mem. In Supp., at 5 n. 1.)

"The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887." *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 138 (4th Cir.2000). Carmack, which codified the common law of carriers, makes a carrier liable "for the actual loss or injury to the property" it transports. 49 U.S.C. § 14706(a)(1); *Ward*, 231 F.3d at 138; *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir.2003) (Carmack imposes near strict liability upon carriers). Carmack's effect is to "create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading."" *Id.* (quoting *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir.1993)); *5K Logistics, Inc. v. Daily Express, Inc.*, 659 F.3d 331, 335 (4th Cir.2011) (Carmack's national scheme strikes "a precise balance between the rights of shippers and carriers").

While carrier liability for actual loss is considered the default rule, Carmack permits a carrier to limit liability by contract. 49 U.S.C. § 14706(c)(1)(A) and (B)[10]; s*ee e.g., ABB, Inc. v. CSX Transportation, Inc.*, EDNC Case No.: 5:08CV25-F, Doc. 105, March 22, 2012 Order.) (analyzing limited liability claim under corresponding statutory exception for rail carriers). In order for the Carmack to limit a carrier's liability, the carrier must:

---

[10] Subsection 14706(c)(1) addresses the ability of motor carriers to limit liability:

(A) Shipper waiver.--Subject to the provisions of subparagraph (B), a carrier providing transportation or service . . . may . . . establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

(B) Carrier notification.--If the motor carrier is not required to file its tariff with the Board, it shall provide . . . to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based. The copy provided by the carrier shall clearly state the dates of applicability of the rate, classification, rules, or practices.

> 1) give the shipper a reasonable opportunity to choose between two or more levels of liability; 2) obtain a shipper's agreement as to his choice of liability; and 3) issue a bill of lading prior to moving the shipment that reflects the agreement.

*Arco Automation Syss., Inc. v. Iscont Shipping Ltd.*, 706 F.Supp. 413, 415 (D.Md. 1989) (including requirement that the carrier maintain a tariff in compliance with ICC requirements, which are no longer applicable as a result of the ICC Termination Act of 1995); *see also Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 135 (4th Cir.1967) (applying former version of Carmack and explaining that "arrangements limiting liability contravene a strong public policy expressed in the common law within a carefully defined exception to the general thrust of . . . the ICC placing on the carrier absolute liability for damage."); *Hansa Meyer Transport GmbH & Co., KG v. Norfolk Southern Ry., Co.*, 2008 WL 2168760, *10 (D.S.C. May 20, 2008) (describing the exception as the Fourth Circuit's "fair opportunity" doctrine). Given Carmack's objective, agreements purporting to limit liability must be "carefully scrutinized." *See Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978). It is the carrier's burden to show that the requisite criteria are satisfied and, therefore, that liability is properly limited. *Arco Automation Syss., Inc.,* 706 F.Supp. at 416.

Landstar contends that Saacke's recovery is "subject to a released rate pursuant to the bills of lading, the published pricing, and [Landstar's] Tariff." (Answer to Am. Compl. ¶ 25). Saacke denies that any limitation to full recovery applies. The undersigned first considers the bills of lading and the effect of each with respect to Landstar's liability.[11]

---

[11] Saacke concedes that "[t]he express terms of the contractual agreement were set forth in the bill of lading(s) governing the shipment of said goods as well as in the implied contractual obligations in use of the trade at issue (goods transportation) and recognized in law." (Am. Compl., ¶ 11)

### A. GES Bill of Lading

Landstar's primary position is that liability is limited by the terms and conditions of the GES bill of lading, which caps liability at $100.00 for one lost pallet. (Answer to Am. Compl. ¶ 29). It is undisputed that the GES bill of lading was completed *prior* to the shipment of the Saacke goods. A review of the GES bill of lading shows that it was prepared on September 19, 2010, and signed by Wortsman on the same day. (Pl.'s Exh. C) The bill reflects that the Saacke goods are to depart "FROM" the IMTS event at McKormick Place, Chicago, Illinois, and go "TO" Saacke in Mooresville, North Carolina. (Id.) Consistent with the Wortsman Affidavit, the section entitled "SHIP VIA:" shows a blank (unchecked) box for "GES Logistics" and a checked box for "Other Carrier" with the handwritten "Landstar" on the blank line. (Id.) The "DATE / TIME LOADED" is shown as "9/21/10." There are miscellaneous terms below the description of the goods, which include a handwritten "shorted 1 pallet" notation. (Id.) In fine print, the GES bill of lading reads in pertinent part:

> "NOTE 2: LIABILITY IS LIMITED TO $0.50 PER POUND PER PACKAGE, $100.00 PER PACKAGE, OR $1,500.00 PER OCCURRENCE, WHICHEVER IS LESS."

(Id.) Immediately below Note 2 is "NOTE 3," which allows for a specific or excess "Declared Value" to be written in – **"Excess Declared Value is available from GES, for shipments moving via GES Logistics."** (Id.) (emphasis provided). The "Declared Value" line is blank, as is the box below it that reads:

> "CHECK HERE IF REQUESTING EXCESS DECLARED VALUE ($2.00 PER $100.00 OF EXCESS VALUATION WILL BE ASSESSED, $100.00 MIN CHG.)"

(Id.) Therefore, the GES bill of lading only gave Saacke the option of declaring an excess value

"for shipments moving via GES Logistics," which was not the carrier option selected.

Saacke contends that liability cannot be limited because Landstar failed to provide Saacke with a reasonable opportunity to select a higher rate in exchange for greater protection. *See e.g.*, *Chandler*, at 134 ("The shipper necessarily may 'agree in writing' only after he has had the opportunity to inspect the written terms.") (internal citations omitted). According to Saacke, neither Hallman or Wortsman was provided an option concerning the level of liability or designated replacement value for any damaged or lost freight. (Hallman Aff., ¶¶ 12, 25, 29; Wortsman Aff., ¶¶ 16, 17). Hallman avers that he would *never* have agreed to limit liability or otherwise agreed to the replacement value now being asserted by Landstar. (Hallman Aff., ¶ 30)

With respect to this inquiry, the following factors have been deemed relevant:

> 1) Whether the provision providing the limitation was specifically brought to the shipper's attention;
> 2) The shipper's sophistication;
> 3) The shipper's abundant experience;
> 4) The shipper's extensive prior dealings with the carrier;
> 5) Whether the shipper drafted the shipping contract;
> 6) Whether the shipper directly negotiated the terms of the shipping contract; and
> 7) Whether the provision [setting forth] the limitation was specifically produced in the bill of lading.

*ABB, Inc. v. CSX Transportation, Inc.*, EDNC Case No.: 5:08CV25-F, Doc. 105, March 22, 2012 Order at 8-9 n. 9 (internal citations omitted).[12] As a whole, the factors tend to weigh in Saacke's

---

[12] This case is currently on appeal to the Fourth Circuit Court of Appeals. *See ABB, Inc. v. CSX Transportation, Inc.*, COA No.: 12-1674. Notably, the Appellant's[ABB's] brief contends that the Fourth Circuit's decision will have a "far-reaching impact on all shippers and carriers, and will determine whether the Carmack Amendment's procedures for ensuring there is a full agreement to a limitation of liability are upheld . . . ." *ABB, Inc.*, Appellant's Brf., 2012 WL 3096713.

favor. First, there is no evidence that the limitation of liability Landstar asserts was specifically brought to the attention of Saacke via Hallman or Wortsman. Rather, the evidence is that Hallman was provided a rate quote for shipment from a third party shipping broker, MIL, as opposed to GES or Landstar.[13] As for level of sophistication, Hallman claims that Saacke (nor Hallman personally) has never "been in the trucking business or any business related to the shipping or transportation of freight or goods," yet Saacke's business is described as "worldwide." (Hallman Aff., ¶¶ 4,5) The shipper's sophistication is neutral given that both of the parties here are corporations and, presumably, possess relatively equal bargaining power. The only evidence pertaining to the shipper's experience is that Hallman avers that trade show sponsors like GES, in his past experience, are known to require a bill of lading for movement of goods in preparation for shipping or outbound transport. (Hallman Aff., ¶ 16) Hallman's representation is consistent with the uses for a bill of lading described, *infra,* as well as the GES Logistics document in evidence. Landstar's remark that Saacke's claim is "patently absurd" is not supported by any evidence or legal authority.[14] In addition, there is no evidence that Saacke

---

[13] While the parties do not address it, it appears from the Landstar bill of lading that the "Shipper's Bill of Lading No." does not match the number on the GES bill, which tends to support Saacke's contention concerning MIL and undermine Landstar's agency argument. In the top right-hand corner of the Landstar bill of lading, beside the typewritten "Shipper's Bill of Lading No." is a handwritten seven-digit number: "0035473." The only comparable seven-digit number on the GES bill of lading is typed and in an enclosed box: "3008582."

[14] Landstar argues, without any factual or legal support, that this representation by Saacke is "patently absurd." (Def.'s Mem. In Opp'n, at 9.) However, Landstar's opposition brief to Saacke's motion includes a copy of a document entitled, "GES Logistics Terms and Conditions of Contract," which expressly disclaims GES liability for loss or damage to goods in various circumstances. (*Id.* / Exh. 1 § VI) For example, the GES contract disclaims liability for goods that are not packaged properly for movement to and from the trade show floor and for goods left unattended during the show and until the loading of the outbound goods. (*Id.* / Exh. 1 § VI (a), (e)) Significantly, GES states that it will not be liable for goods either received at the outset without proper documentation or left on the show floor after the show closing deadline with or without a bill of lading signed by the customer (i.e., Saacke). (*Id.* / Exh. 1 § VI (b), (g))

and Landstar have any prior dealings, which supports Wortsman's contention that he was unaware of the potential legal effect of signing off on either bill of lading. Wortsman states that he did not "consider[] or underst[and] the LANDSTAR bill of lading to be contractual in nature, especially as related to any limitation of liability of LANDSTAR or as to the replacement value of any of the freight shipped . . . ." (Wortsman Aff., ¶ 17) Saacke did not draft either of the bills of lading even though Wortsman added information to the bill of lading provided him by GES. *See Sassy Doll v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 839 (11th Cir.2003) (in this context, shipper "prepares" or "drafts" bill of lading when shipper actually creates the bill of lading as opposed to filling in blanks on a bill of lading created by the carrier). There is no evidence that Saacke directly negotiated any terms of the shipping contract. Indeed, both of the bills of lading were non-negotiable, standardized, preprinted forms generated by GES and Landstar respectively. To the extent terms of the shipping contract were negotiable, negotiations would have been conducted indirectly, through MIL or GES. Finally, while the GES bill of lading expressly purports to limit liability – a factor that would favor Landstar – the GES limitation (or the shipper's option to declare an excess value) only pertains to goods being shipped via GES Logistics.

For all of these reasons, the Court concludes that Landstar's liability cannot be limited by the terms of the GES bill of lading.

### B. Landstar Bill of Lading

Under the Landstar bill of lading, Landstar's liability could not exceed $2,107.00.[15]

---

[15] The Landstar limitation (or released value) is as follows: "$1.00 per pound / $50,000 per truckload shipment for shipments of used goods, not to exceed the actual loss." Because the cargo lost weighed 2107 pounds, Landstar contends that its liability cannot exceed $ 2,107.00. (Def.'s Mem. In

However, Landstar cannot rely on the Landstar bill of lading to limit its liability because the Carmack requirements are not met. *See* 49 U.S.C. § 14706(c)(1)(A) and (B). Aside from any factual dispute regarding Saacke's "fair opportunity" to elect more coverage, the Landstar bill was not produced to Saacke prior to shipment. The bill itself reveals that there is no signature in the designated location for "Shipper" on the day of pick-up. (Pl.'s Exh. B) In the section of the Landstar bill of lading entitled, "Carrier Pick-up Certification," the document indicates that "Carrier Pick-up" occurred on September 20, 2010. (Id.) The section entitled, "Shipper Certification," is blank. (Id.) In the section entitled, "Receiver Certification," and in connection with the consignee's signature (Saacke), there is no date adjacent to the signature of Wortsman on behalf of Saacke. (Id.) As already discussed, *supra*, it is undisputed that Wortsman did not see the Landstar bill of lading until the goods were delivered to North Carolina. For this reason, the Landstar bill of lading does not limit Landstar's liability.

### C. Alleged Agency Relationship Between Saacke and GES

Landstar finally claims that GES acted as Saacke's agent (*i.e.*, shipping agent) in arranging for the return shipment of the goods.[16] (C. Smith Decl., ¶ 4; Def.'s Mem. In Supp., at 7 n. 2.) Consequently, Landstar seeks to hold Saacke to a higher burden as a purported "drafter"

---

Supp., at 11.) As an alternative to limiting Landstar liability to $100.00, provided for by the GES bill of lading, Landstar asks the Court to issue a ruling limiting Landstar's liability to $2,107.00 pursuant to the Landstar bill of lading.

[16] Landstar refers the Court to Saacke's Amended Complaint, which states:

"On or about September 19, 2010, Plaintiff SAACKE, LLC contracted and consigned both directly and / or indirectly through a third party known as Global Experience Specialists (GES) with the Defendant LANDSTAR, INC. to transport materials (shipping date September 21, 2010) belonging to Plaintiff SAACKE, LLC . . . ."

(Am. Compl., ¶ 8)

of the GES bill of lading. (Def.'s Mem. In Supp., at 7-9.) There is no dispute that GES did not *actually* arrange for return shipment on Saacke's behalf.[17]

In light of the GES bill of lading, the relationship between Saacke and GES was also governed by contract. Landstar produces a standard form GES Logistics Contract, which provides in pertinent part:

> It is Customer's [Saacke's] responsibility to complete accurate paperwork for shipping and to ensure Customer Goods are properly labeled. If Customer Goods remain on the floor after the show closing deadline, GES has the right to remove the Customer Goods. ***GES is authorized by Customer to proceed in the manner chosen by Customer on the Order of Material Handling Services / Straight Bill of Lading, if one has been completed,*** or otherwise, to ship Customer Goods at the discretion of GES and at Customer's expense. GES shall incur no liability for such shipment. . . .

(Def.'s Mem. In Opp'n, Exh. 1 § VI (g)). As a result of the GES bill of lading, and GES's attendant contract terms, GES was authorized by Saacke to proceed with outbound shipping of its freight "in the manner chosen by the Customer." (Id.) Therefore, it appears that GES was, in fact, responsible for the movement of Saacke's goods from the trade show floor to the shipping area and likely also present for the physical transfer of Saacke's goods from the shipping area to Landstar.

Nonetheless, Saacke was still fully responsible for its own shipping arrangements. Indeed, GES's function was to proceed *in accordance with the arrangements made by Saacke*. Viewing the evidence in the light most favorable to Saacke (the non-moving party with respect to this sub-issue), the GES Logistics' contract reference to the governing bill of lading did not

---

[17] Rather, Hallman made the shipping arrangements through MIL and MIL's Manion provided Hallman with the applicable rate quotes.

grant GES authority to alter the shipping arrangements decided on by Saacke. In other words, there is nothing in the record to indicate that the GES representative present during the physical transfer of Saacke's goods was tasked with examining Landstar's bill of lading or declaring an excess value upon pick up. Given Congress's objective in enacting the Carmack, the Court concludes that, under these facts, there is insufficient evidence in the record to find, as a matter of law, that GES was Saacke's agent for the purpose of agreeing to limit liability.

### D. Landstar's Tariff

Lastly, the Court considers whether Landstar's Tariff dictates a different result. The term "tariff" is commonly used to refer to "common carrier pricing arrangements" or "published rates" governed by Carmack.[18] *ABB, Inc.*, Order at 4, n. 3 (citing *Babcock & Wilcox Co. v. Kansas City Southern Ry. Co.*, 557 F.3d 134 (3rd Cir. 2009)). Although the term "tariff" is still used, a tariff simply refers to a carrier's standard contract terms, which "have no effect apart from their status as contracts." *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030-31 (7th Cir.2000) (rejecting carrier's contention that its tariff disclaimed all liability for casualties in Mexico; explaining that such a result would be contrary to Carmack and that the shipper had no actual notice that the carrier sought to limit liability.)

In this case, it is undisputed that the "Landstar Ranger Inc. Rules Tariff Series LRGR100B 3/10/2008 was in effect and applied to the shipment of goods at issue . . . ." (Def.'s Responses to Interrogatories, ¶ 1). Rule 410 of the Tariff, entitled "BILL OF LADING,"

---

[18] "Until 1995 tariffs had legal effect; the filed-rate doctrine made it impossible for shippers and carriers to contract around them. The ICC Termination Act, 109 Stat. 803 (1995), abolished the tariff filing requirement and the filed-rate doctrine . . . ." *Tempel Steel Corp.*, 211 F.3d at 1030 (internal citations omitted). The filed-rate doctrine meant that "provisions in tariffs usually governed whether shippers had actual, constructive, or no notice . . . ." *Id.*, at 1031.

provides:

> Landstar Ranger, Inc. is a participant in the National Motor Freight Classification 100 Series (The NMFC). Unless otherwise agreed to in a written Transportation Agreement signed by an officer of Landstar Ranger, all motor carriage performed by Landstar Ranger shall be subject to the terms and conditions of the @ (N) Uniform Straight Bill of Lading as shown in the currently effective NMFC 100 Series. ***Unless such an approval is provided by Landstar Ranger, the shipper's Bill of Lading shall not amend the terms and conditions of carrier's Bill of Lading*** except for provisions which relate to origin, destination, commodity and weight.

(Pl.'s Mem. In Supp., Exh. 6 / Tariff at 5.) (emphasis provided). The Landstar Tariff directs the reader to the terms and conditions of the Uniform Straight Bill of Lading utilized by Landstar, which was not provided to Saacke prior to delivery. (Exh. 6 / Tariff at 5.) The Tariff also expressly provides that, absent Landstar's approval, "the shipper's Bill of Lading shall not amend the terms and conditions of carrier's Bill of Lading."[19] (Id.)

Saacke contends that by seeking to rely on the GES bill of lading, Landstar is disregarding the terms of its own tariff, as well as violating common law principles of good faith and fair dealing. (Pl.'s Mem. In Supp., at 5, 15-16.) Pointing to the Tariff language limiting the effect of a shipper's bill of lading, Saacke contends that Landstar must be bound by its Tariff, or its own standard contract terms. In other words, Saacke argues that Landstar cannot rely on the shipper's bill of lading to limit liability. Because the Court has already reached the same conclusion – that the GES bill of lading does not control – Landstar's Tariff has no impact on the issues presented.[20]

---

[19] While the Tariff identifies exceptions for "provisions relating to origin, destination, commodity and weight," none of the exceptions apply here.

[20] Landstar actually represents that the Tariff language cited by Saacke is *"wholly irrelevant"* given that 1) the tariff provision relied on by Saacke only applies where two bills of lading have

## IV. Order

**IT IS, THEREFORE, ORDERED** that Plaintiff Saacke's Motion for Partial Summary Judgment is hereby **GRANTED** and Defendant Landstar's Motion for Partial Summary Judgment is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall provide the Court with a Status Report no later than **Friday, January 18, 2013**.

Signed: December 17, 2012

Richard L. Voorhees
United States District Judge

---

inconsistent terms; 2) Saacke claims that the Landstar bill of lading "is of no effect because it was not issued until after transportation of Saacke's goods"; and 3) under Saacke's theory of the case, there are no competing terms in separately issued bills of lading to trigger the tariff. (Def.'s Mem. In Supp., at 11.)