IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION No.: 5:11CV107-RLV

| | |
|---|---|
| SAACKE NORTH AMERICA, LLC, )<br>Plaintiff, )<br>)<br>vs. )<br>)<br>LANDSTAR CARRIER SERVICES, INC., )<br>Defendant. )<br>_____ ) | **Memorandum and Order** |

**THIS MATTER** is before the Court upon Motions for Summary Judgment filed by both Plaintiff Saacke North America, LLC ("Saacke") (Doc. 29), and Defendant Landstar Carrier Services, Inc. ("Landstar") (Doc. 31), as well as all related memoranda and exhibits. The cross−motions for summary judgment concern the liability, if any, that Defendant Landstar has to Plaintiff Saacke under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, *et seq*. ("Carmack").[1]

**I.**

The parties agree that summary judgment disposition is appropriate. The relevant and undisputed facts are as follows:

In September 2010, Saacke attended an International Machinists' Trade Show ("IMTS") held at the McCormick Convention Center or McCormick Place ("McCormick Center") in Chicago, Illinois. (Am. Compl., ¶ 9; Hallman Dep., 11). The trade show was sponsored by

---

[1] The Court hereby incorporates by reference its previous factual findings and holding that Landstar did not limit its liability under Carmack pursuant to 49 U.S.C. § 14706(c)(1)(A) and (B). (Docs. 18, 24).

Global Experience Specialists ("GES"), a management company for trade shows. (Am. Compl., ¶ 9; Manion Dep., 57). GES was responsible for all ITMS logistics.[2]

Timothy Hallman ("Hallman"), Saacke Member-Manager, and Mark Wortsman ("Wortsman"), Application and Sales Engineer, represented Saacke at the week-long event. (Hallman Aff., ¶ 2, 14; Wortsman Aff., ¶¶ 2,3). In preparation for the IMTS, Saacke's parent corporation, Saacke GmbH & Company KG, shipped large pieces of machinery manufactured in Germany directly to the McCormick Center for the Saacke display. (Hallman Dep., 6–8, 11–12, 17–18, 35 ). Saacke had also shipped smaller pieces of equipment and a selection of sample tools from its Mooresville, North Carolina facility. (Hallman Dep., 11–12, 17–18, 35).

At the conclusion of the trade show, Wortsman assisted GES in preparing the Saacke goods for the "move-out" from the trade show.[3] (Wortsman Dep., 5; Hallman Dep., 74). As a result of sales made by Saacke in advance of the IMTS, some of the Saacke equipment displayed at the trade show was being shipped directly to the purchaser after the show. (Hallman Dep. 14–15). "[S]even (7) pallets / crates weighing a total of 16,360 pounds" of Saacke freight still had to be transported to Mooresville. (Am. Compl., ¶ 13). Each piece of freight had white stickers in two locations affixed to the exterior identifying the piece of freight as belonging to Saacke, Saacke's address, IMTS Booth Number (7329), and that the package was one of seven pieces. (Wortsman Dep., 25–27). A packing list was also supposed to be attached to the outside

---

[2] A management company such as GES would typically be responsible for coordinating the overall customer trade show experience, including getting packets to customers, ensuring that freight gets to the appropriate place within the facility and set up correctly, coordinating the construction of the displays, and getting freight from the floor to the dock. (Manion Dep., 57–58).

[3] With respect to heavy machinery, the Saacke representatives were expected to instruct the GES local labor force (union workers) on the proper care, placement, and orientation of the item for travel. (Hallman Dep., 39–40).

of each package.[4] (Wortsman Dep., 27–29). Once the packaging and recrating was complete, Saacke representatives were free to go. (Hallman Dep., 40–41). The last time Wortsman saw the goods was the morning of September 20, 2010 in the general area that had been Saacke's trade show booth. (Wortsman Dep., 13–14).

GES required Saacke to sign a Bill of Lading produced by GES for the movement of its freight from Saacke's Booth to the loading area on the roof of the McCormick Center. (Wortsman Dep., 33–34; Hallman Dep. 45, 54). Upon receipt, GES identified and documented Saacke's seven pieces of freight, including three crates, one skid / pallet, and three machines. (Pl.'s Exh. 1 / GES Bill of Lading minus Landstar driver Carl Daniels' signature).

The shipping arrangements for Saacke's commercial goods and equipment were coordinated by Ben Manion ("Manion"), the owner of a shipping broker business, M.I. Logistics ("MIL"), located in Davidson, North Carolina. (Hallman Aff., ¶¶ 6–9; Hallman Dep., 19–20, 45). Saacke and MIL, also a Landstar agent, had conducted business a number of times prior to September 2010 since Saacke did not have an internal logistics department. (Hallman Dep., 25). Typically, arrangements were made orally or through email correspondence and subsequently memorialized in a Bill of Lading prepared by Manion. (Hallman Dep., 25–26). Manion testified that he emailed Saacke a Bill of Lading for this shipment.[5] (Manion Dep., 30–36, 47–49, 75–76). Manion was unable to produce a copy of any Bill of Lading created by MIL.[6] (Manion

---

[4] Packing lists for freight were typically created prior to a trade show in Excel spreadsheet format and edited (ideally) to reflect changes in inventory prior to move-out. (Hallman Dep., 126).

[5] Manion never used the Landstar pre-printed form Bill of Lading. (Manion Dep., 31–32, 66). Instead, Manion employed a system that enabled him to modify and adapt the Bill of Lading per assignment. Id.

[6] For clarity's sake, the Court will refer to this hypothetical Bill of Lading (that could not be

Dep., 47–49). Hallman testified that Manion did not provide a MIL Bill of Lading in this instance because the arrangements were not finalized until the last minute.[7] (Hallman Dep., 46; Manion Dep., 41–43).

MIL selected Landstar as the carrier to transport the Saacke goods after Landstar's driver inquired about the job.[8] (Manion Dep., 46). Hallman avers that prior to shipment, MIL – not GES or Landstar – provided Saacke with a rate quote for the costs of the shipment of the freight. (Hallman Aff., ¶ 11) According to Manion, invoices for the freight charges would ordinarily have been prepared and issued to Saacke directly by Landstar. (Manion Dep., 35).

Whereas GES pre-staged all of the Saacke freight in advance of shipment, Landstar was responsible for the "dock-to-dock" shipment and delivery from Chicago to Mooresville. (Manion Dep., 58). Shipment was scheduled for September 21, 2010. Landstar's driver, Carl Daniels ("Daniels"), was instructed to arrive the day before, be present for check-in during the designated time, and pay the requisite fee – compensation to GES. (Daniels 7/23/13 Dep., 5). Upon arrival at McCormick Center on September 21, 2010, Daniels reported to the designated area for loading. (Daniels 7/23/13 Dep., 6). GES assigned Daniels to a group of trucks that were

---

produced) as the "MIL Bill of Lading." Manion stated that sometimes with trade show pick-ups, the MIL Bill of Lading would not be used and the management company's Bill of Lading would be used instead. (Manion Dep. 74–75).

[7] Whether an MIL Bill of Lading was ever created or produced is not germane to the Court's analysis.

[8] Manion received an email from a former Saacke employee, Martin Segal, that Saacke had freight at the trade show that needed to be returned to North Carolina. Segal sent Manion a list of the items to be transported. Manion then determined what the options for transportation were and entered some basic information concerning the job (e.g., the height and weight capacity of the truck) into the Landstar "load" board or system. (Manion Dep., 37–38). As a Landstar driver, Daniels was able to access the particulars of the load and make contact with Manion. (Daniels 7/23/13 Dep., 4–5).

to load between 4:00 a.m. and 7:00 a.m. (Daniels 7/23/13 Dep., 6, 23). A GES worker placed a sticker on the side of the Landstar truck that corresponded with the Saacke shipment to assist in the loading process. (Daniels 7/23/13 Dep., 6–7, 10–11). Daniels inquired about the size of the load and was permitted to go inside the building to view the pre-staged freight. (Daniels 7/23/13 Dep., 7). At that point, Daniels didn't pay attention to how many items were staged and ready for shipment. (Daniels 7/23/13 Dep., 7). Several GES laborers loaded the freight on Daniels' truck. (Daniels 6/12/13 Dep., 68−69; Daniels 7/23/13 Dep., 8). Daniels tarped and secured the load once it was on the truck. (Daniels 7/23/13 Dep., 8−9; Manion Dep., 59). Because the Saacke freight was required to be tarped, another GES worker inspected the freight after loading. (Daniels 7/23/13 Dep., 9−10). Following GES's inspection, Daniels was told to retrieve the Bill of Lading from GES workers at the central office within the McCormick Center. (Daniels 7/23/13 Dep., 10−11).

After the freight was loaded and inspected, GES provided a copy of its GES Bill of Lading to Daniels. Daniels signed for the seven pieces of Saacke freight "in good order" without exception. (Pl.'s Exh. 2 / GES Bill of Lading plus Daniels' signature). When Daniels signed the GES Bill of Lading, he was unaware that the load consisted of only six pieces of freight instead of seven. (Daniels 7/23/13 Dep., 13, 16). According to Daniels, he counted the items of freight after obtaining the Bill of Lading and realized right away that one piece of freight was missing. (Daniels 7/23/13 Dep., 17). Daniels brought the matter to the attention of the same GES representative that gave him the original paperwork (GES Bill of Lading).[9] (Daniels 7/23/13

---

[9] Daniels claims that he notified the MIL representative of the discrepancy immediately and prior to departing from McCormick Center. (Daniels 6/12/13 Dep., 72−73, 77). According to Manion, Daniels never reported anything about the missing freight until he arrived at the Saacke facility in Mooresville, North Carolina. (Manion Dep., 51−52, 78).

Dep. 18; 6/12/13 Dep. 64−65, 71). GES had one of the forklift operators check the load and the staging area but nothing was recovered. (Daniels 7/23/13 Dep. 19−20). The GES representatives would not allow Daniels to alter the GES Bill of Lading to note an exception to delivery of the load.[10] (Daniels 6/12/13 Dep., 73−77). The freight was never unstrapped or untarped to double check the load. (Daniels 7/23/13 Dep. 17, 20). However, Daniels testified that untarping was unneccesary since nothing was double stacked and the six items were clearly identifiable. (Daniels 7/23/13 Dep., 17). While Landstar's Daniels signed for seven pieces of freight in Chicago, he delivered only six pieces of freight to Saacke upon arrival in Mooresville on September 24, 2010. (Pl.'s Exhs. 2, 3). Daniels, who was in physical possession of the goods for approximately three days, advised Hallman and Wortsman upon arrival at Saacke's Mooresville site that he was not carrying any other freight on this trip other than the Saacke shipment, that he apparently left a piece of freight in Chicago, and that he had driven straight from Chicago to Mooresville. (Hallman Dep., 81−82).

Hallman wrote to GES immediately following the trade show concerning the loss. Hallman explained that Saacke "only received 6 of 7 pieces of freight as listed on [the] BOL # 3008582." (Def.'s Reply / Exh. 1 – 9/24/10 Email to GES). Hallman opined that "[t]he crate (8'x4'x4'), labeled 6 of 7, was not delivered to Landstar." (Def.'s Reply / Exh. 1). In a letter dated July 27, 2011, GES pointed to its Bill of Lading and indicated that because there was no exception noted at the time of delivery to Landstar, it was impossible for GES to determine how

---

[10] The only communication Daniels had with GES representatives was verbal. Daniels is unable to provide names of any of the individuals he spoke with or interacted with as the freight was loaded via forklift from the staging area.

6

or when the crate went missing.[11]  (Pl.'s Exh. 4 / Def.'s Reply / Exh. 2 – 7/27/11 GES Denial Letter).  Saacke filed a statutory claim for cargo loss against Landstar but Landstar denied the claim.  (Am. Compl., ¶ 16 / Answer, ¶ 16).

Saacke has an insurance claim pending with Continental Casualty Company.  (Hallman Dep. 130– 31).  The Continental Casualty policy was purchased by Saacke through MIL for coverage relative to this particular shipment and supplements Saacke's general liability policy with its Insurer, Colonial.  Colonial honored Saacke's claim for reimbursement of lost personal items packed in the missing freight.[12]  (Hallman Dep., 132–33).

Saacke's Carmack claim is for the "loss of [] goods consigned under a bill of lading to Defendant Landstar, an authorized interstate motor carrier."  (Am. Compl., ¶¶ 1–21).  Saacke seeks actual damages for its loss in the amount of $184, 563.27.  (Hallman Dep., 132 / Exh. 3).

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010).   In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a

---

[11] The GES Bill of Lading consisted of an original hard copy plus four carbon copies of the same form.  Therefore, multiple copies of the same Bill of Lading were produced.  The copy retained by GES did not have any remark about a missing piece of freight.  Consequently, the GES Bill of Lading that remained in its possession was the only version or copy that could be treated as a "clean bill of lading" for purposes of triggering the presumption that the goods were delivered in good origin condition as promised.

[12] Colonial reimbursed Saacke between $16,000 and $20,000 for loss of personal items that were in the missing piece of freight. (Hallman Dep., 132–33).

7

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325.

When considering cross-motions for summary judgment, the court "examines each motion separately, employing the familiar [Rule 56(c)] standard." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (internal citations omitted); *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (Court reviews each motion separately on its own merits "to determine whether either party deserves judgment as a matter of law") (internal citations omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Rossignol,* 316 F.3d at 523 (internal citation omitted).

### III.

"The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887." *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 138 (4th Cir. 2000). Carmack, which codified the common law of carriers, makes a carrier liable "for the actual loss or injury to the property" it transports. 49 U.S.C. § 14706(a)(1); *Ward*, 231 F.3d at 138; *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir. 2003) (Carmack imposes near strict liability upon carriers). Carmack's effect is to "create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading."" *Id.* (quoting *Shao v. Link Cargo*

*(Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir.1993)).

"Carmack's purpose is to relieve cargo owners "of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."" *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2436 (2010) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)); *5K Logistics, Inc. v. Daily Express, Inc.*, 659 F.3d 331, 335 (4th Cir. 2011) (Carmack's national scheme strikes "a precise balance between the rights of shippers and carriers"). As a result, the shipper has no burden to determine which of several carriers caused the loss. *5K Logistics*, 569 F.3d at 335 (internal citation omitted); *Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 294 (4th Cir. 1990). Carmack places the burden instead on the carriers and provides for apportionment amongst multiple carriers.[13] 49 U.S.C. § 14706(b). In addition, the Carmack scheme permits shippers "to bring suit against either the initial carrier (the issuer of the bill of lading) or the delivering carrier . . . ." *5K Logistics*, 659 F.3d at 335 (quoting *Reider*, 339 U.S. at 119).

In order to recover under Carmack, shippers need only make out a *prima facie* case. *5K Logistics*, 659 F.3d at 335 (citing *Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137–38 (1964)). A *prima facie* case requires that Saacke show "good origin condition, damaged destination condition, and the amount of its damages." *Kawasaki Kisen Kaisha Ltd.*, 130 S. Ct. at 2436; *ABB, Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 138, n. 4 (4th Cir. 2013). If established

---

[13] A key component of Carmack is that the allocation of fault or responsibility for a shipper's loss is left to the carriers. Congress determined that: "The carrier issuing the receipt or bill of lading under subsection (a) of this section or delivering the property for which the receipt or bill of lading was issued is entitled to recover from the carrier over whose line or route the loss or injury occurred the amount required to be paid to the owners of the property, as evidenced by a receipt, judgment, or transcript, and the amount of its expenses reasonably incurred in defending a civil action brought by that person." 49 U.S.C. § 14706(b).

by the shipper, a *prima facie* case "shift[s] the burden to the carrier to prove that it was not negligent and that the damage was caused by an event excepted by the common law."[14] *5K Logistics*, 659 F.3d at 335 (internal citation omitted).

The first *prima facie* element of good origin condition speaks only to the condition of the goods *at their origin*. Therefore, in the event that multiple carriers (or a motor carrier and a freight forwarder) are utilized, good condition need only be shown to exist upon receipt by the "initial, receiving carrier." *See* 49 U.S.C. § 14706(a)(1).

The second *prima facie* element of damaged destination condition is not in dispute since Saacke need only show that the freight (the missing pallet / crate) did not arrive at its destination. *Elmore & Stahl*, 377 U.S. at 138; *Kawasaki Kisen Kaisha Ltd.*, 130 S.Ct. at 2444. Here, the parties agree that Saacke lost one pallet or crate (with the dimensions 8' x 4' x 4') between point A (Chicago) and point B (Mooresville).

The third *prima facie* element is that Saacke prove up its amount of damages. Carmack imposes liability upon carriers for "actual loss or injury to the property." *5K Logistics*, 569 F.3d at 336 (citing 49 U.S.C. § 14706(a)(1)). Saacke asks for replacement cost for the lost items. *See e.g., Oak Hall Cap & Gown*, 899 F.2d at 296 (approving shipper's replacement cost as a proper measure of damages for damaged goods deemed worthless or beyond salvage). To support its claim for damages, Saacke provides packing slips created prior to shipment, a spreadsheet listing the items stored for transport in the lost pallet / crate with corresponding replacement

---

[14] Events excepted by the common law include: "(1) an act of God; (2) the public enemy; (3) the act of the shipper himself; or (4) the inherent vice or nature of the goods." *Rush Indus., Inc. v. MWP Contractors, LLC*, 2012 WL 6010059, * 7 (M.D.N.C. 2012) (citing *Elmore & Stahl*, 377 U.S. at 137–38). In this case, Landstar asserts it was not negligent, but does not argue the existence of an exception to the common law. Therefore, as long as Plaintiff Saacke is able to make out a *prima facie* case, Landstar is subject to Carmack liability.

costs, and copies of receipts and invoices related to the lost items. (Am. Compl., Attachment 1 / Exh. A; Hallman Dep. 98–99, Exh. 3).

**IV.**

The parties' summary judgment filings focus on whether or not Saacke's evidence is sufficient, as a matter of law, to establish the first *prima facie* element, the tender of seven pieces of freight in good origin condition. Specifically, the parties disagree about whether GES is properly characterized as the "initial, receiving carrier" under § 14706(a)(1) and whether Saacke must show good origin condition to GES or Landstar.

**A. Saacke's Motion For Summary Judgment**

Saacke's summary judgment motion depends upon the characterization of GES for purposes of Carmack. Landstar contends that Carmack does not govern Saacke's relationship with GES since GES is not a "motor carrier" and does not fall within the jurisdiction of Carmack. However, the procurement of interstate transportation and related services also implicate Carmack.[15]

Statutory liability under Carmack is established for "carriers," including motor carriers and freight forwarders. 49 U.S.C. § 14706(a)(1). Under Section 14706(a)(1), "[a] carrier providing transportation or service subject to [Carmack] jurisdiction shall issue a receipt or bill of lading for property it receives for transportation . . . ." *Id*. "That carrier **and any other carrier**

---

[15] Carmack's general jurisdiction includes "transportation by motor carrier ***and the procurement of that transportation***, to the extent that . . . property [is] transported by motor carrier . . . between a place in a State and a place in another State." 49 U.S.C. § 13501(1)(A) (emphasis added). Carmack also has general jurisdiction "***over service that a freight forwarder undertakes*** to provide . . . to the extent transportation is provided in the United States and is between – a place in a State and a place in another State . . . ." 49 U.S.C. § 13531(a)(1) (emphasis added).

11

*that delivers the property* and is providing transportation or service subject to [Carmack] jurisdiction are liable to the person entitled to recover under the receipt or bill of lading."[16] *Id.* (emphasis added). A carrier's failure to issue a receipt or bill of lading does not affect liability. *ABB, Inc.*, 721 F.3d at 138 and 138, n. 2 (quoting rail carrier statute that corresponds to motor carrier statute).

In order to determine whether the factual questions recited herein present genuine issues of material fact, the Court must consider GES's status for purposes of Carmack. The facts related to Saacke's motion for summary judgment are viewed in the light most favorable to Landstar.

While carriers are held to Carmack's near strict liability scheme, brokers are not subject to Carmack jurisdiction. *5K Logistics*, 659 F.3d at 335. The first question before the Court is whether GES was a "broker" or a "carrier" as defined by Carmack. The Court's analysis begins with the statutory definitions.

Pursuant to Carmack, a "broker" is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier" that sells, offers for sale, negotiates for, or holds itself out . . . as providing, or arranging for, transportation by motor carrier for compensation." *5K Logistics*, 659 F.3d at 335 (quoting 49 U.S.C. § 13102(2)); *Consolidated Freightways*, 2003 WL 22159468, * 6. "[B]rokers do not play a role in the actual assembly or carriage of [] goods." *Transp. Revenue Mgmt., Inc. v. First NH Inv. Servs. Corp.*, 886 F.Supp. 884, 886 n. 5 (D.D.C. 1995).

---

[16] Landstar is the "delivering carrier" as defined by Carmack since Landstar was the entity responsible for delivery to Saacke at its facility in Mooresville, North Carolina.

The term "carrier" refers to a "motor carrier, a water carrier, or a freight forwarder." 49 U.S.C. § 13102(3). The term "freight forwarder" is defined by statute as "a person holding itself out to the general public (other than as a . . . motor carrier . . .) to provide transportation of property for compensation and in the ordinary course of business – (A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments; (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and (C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle. 49 U.S.C. § 13102(8)(A)–(C). A "freight forwarder" can be "both the receiving carrier and the delivering carrier." 49 U.S.C. § 14706(a)(2); *IBM v. Fernstrom*, 1987 WL 8170 (N.D. Ill. March 18, 1987).

"Transportation" is defined broadly and includes--

>   (A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and
>   (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

49 U.S.C. § 13102(23).

"Whether a company is a broker or a carrier / freight forwarder is not determined by how it labels itself, but by how it holds itself out to the world and its relationship to the shipper."[17]

---

[17] The record here is fully developed unlike the cases where summary judgment disposition is found to be inappropriate because the role or status of an entity has not been explored in discovery. *See e.g., Nipponkoa Ins. Co., Ltd. v. Atlas Van Lines, Inc.*, 687 F.3d 780, 781 (7th Cir. 2012) (summary judgment inappropriate where further development of the details of the shipping contract and nature of the relationship among the four companies was required); *Consolidated Freightways*, 2003 WL 22159468, * 6 (N.D.Cal. March 28, 2003) (unpublished) (whether GES is a "broker" or a "motor carrier" cannot be resolved as a matter of law); *but see Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358,

*Lumbermen's Mutual Cas. Co. v. GES Exposition Servs., Inc.*, 303 F.Supp.2d 920, 921 (N.D.Ill. 2003) (genuine issue of material fact as to whether shipping agent was a broker or a carrier / freight forwarder precluded summary judgment); *Underwriters at Lloyds v. FedEx Truckload Beverage, Inc.*, 2010 WL 2681224, * 5 (S.D. Fla. 2010) (Carmack status determined not by authority to act as a carrier, but by reference to whether it "actually acted" as a carrier). Landstar makes much of the fact that GES is registered as a transportation broker.[18] (Def.'s Exh. 1). As explained herein, this one factor is not determinative of GES's status, particularly given Landstar's concession that GES also holds itself out as a carrier. *See e.g., Phoenix Assur. Co. v. K-Mart Corp.*, 977 F.Supp. 319, 325–26 (D.N.J. 1997) (party's registration as a property broker and failure to register as a carrier held not dispositive of party's Carmack status or liability under Carmack); *Nipponkoa Ins. Co. v. CH Robinson Worldwide, Inc.*, 2011 WL 671747, * 4–6 (S.D.N.Y. 2011) (Carmack status determined by "services offered by an entity, rather than by its corporate character or declared purpose."). Moreover, GES did not procure the transportation of Saacke's goods through Landstar – a quintessential broker function. (Hallman Dep., 45, 121). MIL, through Manion, secured Landstar to make the trip.

Viewing the facts in the light most favorable to Landstar, the relationship between GES and Saacke was one of shipper-carrier. GES held itself out to Saacke as a carrier. Accompanying or attendant to the GES Bill of Lading, the "GES Logistics Terms and Conditions" represented that GES may act as a carrier and that GES retained the discretion to transport the freight under given circumstances. Even though GES was obliged to proceed consistent with Saacke's

---

1361–62 (7th Cir. 1997) (plaintiff failed to establish that defendants were freight forwarders for purposes of Carmack).

[18] Since brokers are not subject to Carmack liability, it is not surprising that GES would more readily identify itself as a broker than as a carrier or freight forwarder. *See 5K Logistics*, 659 F.3d at 335.

election to hire Landstar, GES offered to arrange transportation for Saacke via its "GES Logistics Terms and Conditions."  In *Mach Mold, Inc. v. Clover Assocs., Inc.*, the court noted that the Code of Federal Regulations read in part:

> Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

383 F.Supp.2d 1015, 129–30 (N.D. Ill. Aug. 2005) (citing 49 C.F.R. § 371.2(a) (2005) (granting summary judgment in favor of shipper explaining that if defendant entity had been authorized to transport the machine and accepted and legally bound itself to do so, it would not be a broker but would be acting as a "motor carrier" for the purposes of the ICA); *Eastco Intern. Corp. v. Coyote Logistics, LLC*, 2009 WL 5125193, * 2–3 (N.D. Ill. 2009) ("carriers do not become brokers just because they arranged for someone else to transport a shipment they 'accepted and [are] legally bound themselves to transport.'").  While GES did not arrange transportation in this case, GES moved the freight to the McCormick Center loading area and was equipped to arrange for transport to the final destination had it been called upon to do so.

GES performed other necessary transportion functions, making the shipment of Saacke's goods by Landstar possible. Here, the GES Bill of Lading expressly held GES out as being able to provide "material handling services." (GES Bill of Lading).  In fact, GES's services primarily consisted of the handling, moving, assembling, and packing of Saacke's freight. *See e.g., Consolidated Freightways*, 2003 WL 22159468, * 6 (recognizing performance of transportation functions as evidence indicative of GES entity's proper classification as a "motor carrier"). The initial transfer of Saacke's goods took place at the end of a trade show with the goods being tendered to GES, a trade show management company, in order to prepare the goods for shipment

by Landstar.[19] It is undisputed that GES assumed responsibility for Saacke's freight pending delivery to Landstar. Likewise, GES worked in tandem with Landstar to facilitate the Saacke shipment by receiving Saacke's freight, issuing a Bill of Lading, moving the freight from the trade show floor to the loading area, and delivering it to Landstar.

The Court next considers the nature of the shipment, specifically whether anything about the shipment informs the inquiry about the status of GES.[20] The Court looks to the Bills of Lading for the terms of the parties' agreement concerning shipment. The GES Bill of Lading expressly noted that the goods were to be transported "VIA: other carrier" (*i.e.*, Landstar) to their ultimate destination. (Wortsman Aff., ¶¶ 5, 6). Significantly, in both of the Bills of Lading, that destination was identified as "Mooresville, North Carolina." (Pl.'s Exhs. 1, 2). There was no division or sharing between GES and Landstar in the actual "dock-to-dock" transportation of the Saacke goods between Illinois and North Carolina. Once the goods were placed in Landstar's possession – from the tradeshow venue in Chicago – they were Landstar's sole responsibility. Moreover, Saacke paid Landstar for the full cost of transportation. (Hallman Dep., 85–86, 118). Saacke paid GES separately for its logistical services prior to shipment. (Hallman Dep., 43–46;

---

[19] Physical contact with freight has been found to be a significant factor in determining an entity's status for Carmack liability. *See e.g., Nipponkoa Ins. Co. v. CH Robinson Worldwide, Inc.*, 2011 WL 671747, * 4–6.

[20] Landstar contends that there was no "through bill of lading," and that this job consisted of two distinct trips such that GES cannot be designated the "initial, receiving carrier" for purposes of the *prima facie* case against Landstar. *See Beautifax, Inc. v. Puerto Rico Marine Mgmt., Inc.*, 611 F.Supp. 537, 544 (D.Md. May 29, 1985) (characterization of shipment as one or two distinct trips affects status of entity that could be deemed an intermediate carrier exempt from Carmack liability as opposed to delivering carrier; distinguishable on its facts for multiple reasons including the fact that in *Beautifax* the receiving carrier's bill of lading identified its own separate geographical "Final Destination"). Whether the GES Bill of Lading governed the entire shipment is irrelevant under § 14706 because failure to issue a bill of lading does not affect liability. *See ABB, Inc.*, 721 F.3d at 138. In any event the GES Bill of Lading did not limit liability for the reasons stated in the December 2012 Memorandum and Order. (M & O, 9–12).

Manion Dep., 26).

In the instant case, no jury could reasonably find that there were two separate and distinct shipments. The evidence of record tends to show that the movement of Saacke's goods constituted a single shipment and a common enterprise. GES was an event sponsor – the management company running the tradeshow. As such, GES was the designated party responsible for preparing goods for shipment or "pre-staging." The only physical movement GES was responsible for was from the Saacke Booth 7329, on the trade show floor to the shipping area in the same venue. In fact, GES was *the only entity* available to Saacke (and the other trade show customers) to facilitate the transfer of goods. GES produced its GES Bill of Lading to Landstar driver Carl Daniels and required Daniels' signature before the goods were officially released. Pursuant to guidance from GES, Landstar obtained and secured its load for delivery to North Carolina.

For all of these reasons, the evidence establishes, and the Court so finds, as a matter of law, that GES held itself out and, in fact, operated as a "carrier" for purposes of Carmack. In light of the Court's finding that GES acted as the "initial, receiving carrier," Saacke's evidence demonstrating good origin condition to GES at the conclusion of the IMTS (after the goods were repackaged and tendered to GES on the trade show floor) is sufficient to establish the *prima facie* case and entitle Saacke to recovery under Carmack.

Saacke's motion for summary judgment will be <u>granted</u>.

**B.  Landstar's Motion for Summary Judgment**

Landstar argues that Saacke cannot meet its burden as to the first *prima facie* element. Landstar's summary judgment motion is premised on the following arguments: 1) that GES is not a Carmack "carrier"; and 2) that the "undisputed" facts show that the missing piece of freight

belonging to Saacke was never tendered to Landstar's driver. Since the Court finds, as a matter of law, that GES is a "carrier" as defined by Carmack, and since Saacke is permitted to bring suit against either the "initial, receiving carrier" or the "delivering carrier," 49 U.S.C. § 14706(a), Landstar does not create a genuine issue of material fact by contending that Saacke cannot prove that Landstar's driver never received the missing piece of freight.

Finally, to the extent Landstar contends that GES was actually responsible for the loss, Landstar's remedy is to seek indemnification from GES. *See* 49 U.S.C. § 14706(b); *see also 5K Logistics*, 659 F.3d at 337 (reciting shipper's election to bring suit against any carrier who participates in the transportation called for in a bill of lading and the ability of that carrier to seek indemnification from the responsible party); *Union Pacific R.R. Co.*, 293 F.3d at 124–25 ("An initiating or delivering carrier liable to a shipper may . . . recover from a connecting carrier for damages that occur on the connecting carrier's line.")

Landstar's motion for summary judgment will be <u>denied</u>.

### V.

**IT IS, THEREFORE, ORDERED** that Saacke's Motion for Summary Judgment is hereby **GRANTED** and Landstar's Motion for Summary Judgment is hereby **DENIED**.

Signed: December 19, 2013

Richard L. Voorhees
United States District Judge